**James EARLY, Appellant,**

**v.**

**Margaret M. HECKLER, Secretary of Health and Human Services.**

**No. 83–3619.**

United States Court of Appeals, Third Circuit.

Argued July 19, 1984.

Decided Sept. 14, 1984.

---

Janet A. Conser, Denise Niedzielski (Argued), Legal Services of Northeastern Pennsylvania, Inc., Wilkes-Barre, Pa., for appellant.

David Dart Queen, U.S. Atty., Sally A. Lied, Asst. U.S. Atty., M.D.Pa., Harrisburg, Pa., Beverly Dennis, III, Regional Atty., Edith M. Ho (Argued), Asst. Regional Atty., Region III, Dept. of Health and Human Services, Philadelphia, Pa., for appellee.

Before SLOVITER and BECKER, Circuit Judges, and FULLAM, District Judge.[*]

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

James Early appeals from a decision of the Secretary of Health and Human Services denying his claim for disability benefits under the Social Security Act. Early was initially determined by the Secretary to be disabled due to gouty arthritis as of May 28, 1976 and received disability benefits; however, the Secretary found that Early had ceased to be disabled as of December 1981 and was therefore not entitled to ben-

---

[*] Hon. John P. Fullam, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

efits as of February 1982.[1] A hearing was held before an Administrative Law Judge (ALJ), who concluded that Early had the ability to perform sedentary work and, consequently, was no longer disabled. After the Appeals Council denied Early's request for review, and the Secretary's decision became final, Early filed this action pursuant to 42 U.S.C. § 405(g). Both parties filed motions for summary judgment, the magistrate recommended that the Secretary's motion be granted, and the district court entered judgment for the Secretary.

The determinations of both the Secretary and the magistrate as to Early's burden to prove his disability predate this court's decision in *Kuzmin v. Schweiker*, 714 F.2d 1233 (3d Cir.1983). In *Kuzmin*, we held that in a termination proceeding, once a claimant introduces evidence, as here, that his or her condition "remains substantially the same as at the time of the earlier determination, the claimant is entitled to the benefit of a presumption that his or her condition remains disabling." *Id.* at 1237. The district court made an independent review of the record in light of *Kuzmin*, and found itself "unable to conclude that any determination by the Secretary that Plaintiff's condition has so improved would [ ] be supported by substantial evidence."[2] App. at 56a. Consequently, the court found that Early's benefits could "not be terminated upon this basis." *Id.* However, the court found that Early's admission that he could perform sedentary work "must be given substantial weight." *Id.* It therefore concluded that the Secretary's decision was supported by substantial evidence on the basis that Early's testimony alone showed either that the initial determination was erroneous or that his condition had improved sufficiently to allow him to undertake gainful activity. *Id.* at 56a–57a.

We disagree because we conclude that Early's testimony does not constitute sub-stantial evidence of the kind necessary to support the Secretary's finding of nondisability, and that there is no other evidence on the record tending to show that Early's condition had improved.

## II.

James Early was 44 years of age at the time of the administrative hearing and has a high school education. He has worked as a route salesman, truck driver, and welder. Early maintains that he continues to suffer, as he did at the time of the initial determination of disability in May 1976, from acute and painful exacerbation and swelling of his joints, occasional locking of the joints, and sudden flare-ups of his gouty condition, even while on prescribed medication for gout.

On December 4, 1981, Dr. Joseph R. Sgarlat, a general and orthopaedic surgeon, performed a consultative orthopaedic examination on Early. Dr. Sgarlat reported that Early was being treated at the Veterans Administration Hospital and "takes gout medication regularly", and that he "continues to have pain in his elbows, knees, hands, wrists and feet and walks with a cane." App. at 86a. Dr. Sgarlat also reported that there had been "recurrences of subcutaneous nodules along the areas of the elbows ..., but not in the foot," and that Early had "normal" ranges of motion in the shoulders, hips, knees, and ankles, "almost full" ranges of motion in both elbows, "mild loss of full motion" in the wrists, and "full opening and closing" in the hands, except that his left small finger sometimes locks in flexion. *Id.* Dr. Sgarlat found "some grating in the knees but no joint effusion." An x-ray was taken of Early's left knee, the joint he said gave him the greatest problem. *Id.* Dr. Sgarlat concluded that the x-rays were "within normal limits" and that there were

---

1. Due to a typographical error, the ALJ's decision specified February 1981. The error was corrected by a modification of the decision by the Appeals Council.

2. The court's language is actually "would not be supported by substantial evidence": however, it appears that "not" is a typographical error, given the court's conclusion that Early's benefits could *not* be terminated on this basis. *See* text accompanying this footnote.

"no gouty arthritic signs present." *Id.* Dr. Sgarlat's diagnosis of Early's condition was "gouty arthritis involving primarily his elbows, ... a condition that is treatable with proper medication and when given properly should allow the patient to resume very nearly normal activities." *Id.* at 87a. Dr. Sgarlat's opinion was that in Early's present condition, he would be able to do "at least a sedentary or even a light job." *Id.*

Early's treating physician at the VA Hospital, Dr. Sharma, reported that Early suffered from pain and swelling in his knees and elbows that had grown progressively worse despite his medications, which included Allpurinol, Colchrin and Indocin, and that Early therefore had difficulty walking. Dr. Sharma's diagnosis was chronic tophaceous arthritis in the knees and elbows and mild mid-tender swelling of the both knees and elbows. App. at 115a–16a. In April 1982, Dr. Sharma concluded that Early was "not able to work because of his severe disability," App. at 121a, and several months later restated that Early was "totally disabled by gout." App. at 115a–17a.

The medical records in 1981 and 1982 show several in-patient hospitalizations and out-patient treatments because of flare-ups of gout, App. at 81a–85a, 88a–113a, during which acute exacerbation and swelling was noted. App. at 85a, 94a–95a, 103a. The medical records also document Early's complaints of pain and stiffness in the joints despite the use of medication. App. at 103a, 105a, 109a.

A review of the medical records of Early's treatment and hospitalizations from January 1982 to July 1982 reveals that Early "cannot walk or stand and that both knees swell, [H]as pain in right instep" (App. at 109a); "left knee swells [when] walking and is painful", "sudden pain in left knee", "has gout involving both knees and walking ... is difficult for him" (App. at 110a); "pain and aches in various joints, knees, ankles and elbows", (App. at 111a);

"consistently runs high uric acid" (App. at 113a); "has severe gout involving all his joints particularly both knees and ankles", "requires frequent assistance and walks with a cane," "is not able to work because of his severe disability." (App. at 114a); "pain and swelling in all his joints involving toes, knees, elbows. Diff[iculty] in walking because of painful knees. [C]ondition got worse, progressively worse despite medication." (App. at 115a). "Chronic tophaceous arthritis-knees and elbows mild-mod. Tender swelling left and right knees and left and right elbows" (App. at 116a); "unable to make fist (grasp) in either hand", "Hand x-rays are more consistent with severe gout." (App. at 118a). The record also refers to laboratory findings and x-ray reports (App. at 119a), which are the basis for Dr. Sharma's conclusion as to the severity of Early's impairment. After an examination in July 1982, Dr. Sharma reported that Early was suffering from a locking of the fifth finger of the left hand when in full flexion and a locking of the left knee, and that x-rays of Early's hands were consistent with severe gout. App. at 118a.

At the hearing, Early testified that he experiences considerable pain when he walks or bends, Tr. at 37, and that he often sleeps only one hour per night because of his pain. Tr. at 45. He also testified that when he sits, his knees lock and he often must get help from his wife in order to straighten out his knees, Tr. at 35, that he has difficulty holding or gripping with his hands, Tr. at 36, and that he does not have the full use of his right elbow. Tr. at 48. Early testified that he follows the doctor's orders in regard to taking his medication and denied not taking medication as directed. Tr. at 33. In response to a question by the ALJ, Early said that he thought he could perform a sitting job where he could stand when he wanted and have to lift no more than two pounds, such as a cashier at a self-service gas station or a parking garage. Tr. at 28.[3] However, when ques-

---

**3.** The full colloquy was as follows:

Q: Have you done any work since 1976?

A: No, I did not.

tioned more fully on this issue, Early explained his earlier statement and gave details about his physical condition which throw considerable doubt on the Secretary's position and the district court's finding that Early categorically admitted he had the capacity for work:

Q: Well how long can you sit without having to get up, like you're sitting here now? And of course if you want to get up, feel free to get up. And of course we can still· proceed with the hearing. But how long can [you] sit like you're sitting now without having to get up, of course you've already set [sic] for more than ten minutes.

A: Well I can sit for about an hour.

Q: If you shift your position?

A: Shifted. Yes.

Q: And since you stopped working has your condition gotten better or worse or remained the same?

A: *My condition has got worse.*

Q: Are you able to care for your personal needs?

A: Yes.

Q: Are you able to lift. Can you lift ten pounds?

A: No, I cannot.

Q: Why can't you lift?

A: Cause I can show you why. I'll just lift this book for a minute, or whatever. My hand is swelling up.

Q: Well you told me that you thought you could perform a job where you could

alternate standing and sitting and lifting nore more than ten pounds.

A: Yes, I gotta say why I can't lift. Just this little bit with this book, here will make my hand swell up.

Q: Alright, you say you can't lift then?

A: I can't lift.

Q: Okay. How do you think you could perform a job if...

A: You know what I think there...

Q: How do you think you could perform a job if you can't lift?

A: *Well that's why I don't know if I can perform a job.* I cannot lift. This is my problem.

Tr. at 38–39 (emphasis added). Subsequently, Early testified that he could not stoop, squat, or kneel. Tr. at 40.

The ALJ found that at the time of the termination hearing in June 1982 Early was suffering from gouty arthritis and was being treated at the Veterans Administration Hospital in Wilkes-Barre, Pennsylvania. However, the ALJ concluded that Early's subjective complaints of pain were not supported by the objective evidence. He found that Early did experience pain, but that the record did not support the presence of such severe, persistent pain as would prevent him from working. The ALJ concluded that, on the basis of Dr. Sgarlat's report and Early's own testimony, Early did not have a severe impairment and was capable of performing sedentary work. The ALJ

Q: Have you attempted to do any type of work?

A: Yes, I tried to, well just some walking and every time I walk I swell up so I can't do no work.

Q: You say you can do any type work?

A: *I can do no work now.* I went to tractor trailer school and I do have a license but I can't even get into the truck, now. I can't...

Q: Think you could do a sitting job, where you sit at the table like you're doing now and lift no more than two pounds. Stand when you want to and sit when you want to.

A: I could, yes I think I could do just that. As sitting for a while, my knees, the joints in my knees get tightened up and I can't sit too long either.

Q: Or you could stand and sit when you want to?

A: Stand and sit.

Q: Yes. Well, say like a job as an operating self service gas station. You could sit inside a heated building, you don't pump the gas, they come in and pay you. You just get up and make change, stuff like that. Think you could do that?

A: Yes.

Q: Course they have the jobs here, parking garage attendant here in Wilkes-Barre where you sit, you don't park the car, you just sit inside of a hut or inside of the building and people come and go and you just collect the money. Think you could do that?

A: Yes.

Tr. at 28–29 (emphasis added).

made no findings as to the contrary medical evidence presented by Dr. Sharma.

Although it is not in the record, the parties have confirmed that Early again applied for disability benefits in October 1982, and they were granted in November 1982. Thus, we are dealing with a closed benefit period of alleged nondisability, as in *Kuzmin,* 714 F.2d at 1236.

### III.

In reviewing final determinations by the Secretary after an administrative hearing, courts are bound by the Secretary's findings of fact if they are supported by "substantial evidence." 42 U.S.C. §§ 405(g); 1383(c)(3). Substantial evidence has been defined as such evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Dobrowolsky v. Califano,* 606 F.2d 403, 406 (3d Cir.1979). A person is disabled within the meaning of the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C.A. § 423(d)(2)(A) (1983); 42 U.S.C. § 1382c(a)(3)(B).

■■■ Under the Act, the burden of proof as to the medical basis of a finding of disability remains on the claimant at all times, both in the initial proceeding to establish disability and in a subsequent termination proceeding. *Torres v. Schweiker,* 682 F.2d 109, 111 (3d Cir.1982), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1020 (1983). However, in a termination proceeding, after the claimant has introduced evidence that his or her condition remains essentially the same as it was at the time of the earlier determination, the burden shifts to the Secretary to "present evidence that there has been sufficient improvement in the claimant's condition to allow the claimant to undertake gainful activity." *Kuzmin v. Schweiker,* 714 F.2d at 1237.

■ On this record, we conclude that while Early has introduced evidence that his condition remains the same, the Secretary has failed to carry the burden to show Early's condition had sufficiently improved that he could undertake substantial gainful activity. As the district court found, the ALJ, whose decision predated *Kuzmin,* made no finding of medical improvement, and the district court was also unable to conclude from the evidence on this record that there was sufficient medical improvement to allow claimant to undertake gainful activity.

In addition, the ALJ did not make any reference to the medical evidence of disability presented by Early's treating physician, Dr. Sharma. The ALJ made no findings as to Dr. Sharma's detailed medical findings and conclusion that Early "is not able to work because of his severe disability." App. at 114a.[4] This evidence, which was both extensive and detailed, conflicted with the brief report of the consultative physician, Dr. Sgarlat, on which the ALJ relied. As we stated in *Cotter v. Harris,* 642 F.2d 700, 701, 706 (3d Cir.1981), "there is a particularly acute need for some explanation by the ALJ when s/he has rejected relevant evidence or when there is conflicting probative evidence in the record." Consequently, we cannot affirm termination of Early's benefits on the ground that there is substantial evidence that his medical condition had improved.

■■ The remaining ground for termination on this record is Early's testimony

---

**4.** Subsequent to the hearing before the ALJ, Early submitted to the Appeals Council additional evidence consisting of the Veterans Administration medical reports from June 9 to July 15, 1982. In the later report, Dr. Sharma reconfirmed that Early was "totally disabled by gout." The Appeals Council denied Early's request for review of the hearing decision after considering the additional evidence.

at the hearing, at which he was unrepresented by counsel, that he was capable of performing some kinds of sedentary work. However, Early's testimony was in fact equivocal and conflicting; although he indicated initially that he thought he could do some types of sedentary work, his answers to more specific questions were inconsistent with this conclusion. Thus, in response to questions, he testified that he could sit for a period of about one hour if allowed to shift his weight, that his knees often locked while sitting, and that he could not lift a book without his wrists swelling. This testimony as to physical limitations was supported by the reports of the treating physician, Dr. Sharma, who described Early as totally disabled.

In evaluating Early's testimony, it is significant that he was unrepresented by counsel. As we stated in *Dobrowolsky v. Califano*, 606 F.2d at 407, when a claimant is unrepresented the ALJ has a "duty to develop the record with special care." When we examine this record with the "heightened level of care" appropriate under *Dobrowolsky*, we are unable to affirm termination of Early's benefits on the basis of his equivocal testimony as to his capacity. At most, some of the statements taken out of context might be read as suggesting capacity to perform certain limited tasks, but the testimony read in its entirety, as it must be, is inconclusive.

We conclude that Early's testimony is not substantial evidence of improvement. Thus, neither the medical reports nor Early's testimony constitute substantial evidence to support a determination of nondisability.

 The Secretary argues, nevertheless, that Early's condition was treatable but that he failed to take his medicine regularly.[5] The ALJ made no finding on the issue, and there is insufficient basis on the record for the court to do so as an initial matter.

The record reveals that the treating physician, Dr. Sharma, merely speculated that Early's lack of improvement may have been caused by failure to take medication regularly; and Dr. Sharma noted that Early insisted this was not the case. The consultative physician, Dr. Sgarlat, reported that Early "takes his gout medicine regularly." This insubstantial evidence would be insufficient to support a termination of benefits, even had the ALJ addressed the issue.

### IV.

We conclude there is no substantial evidence to support the Secretary's determination that Early was no longer disabled as of December 1981. Although we have previously affirmed our authority to direct the grant of summary judgment for the claimant, *see Dobrowolsky*, 606 F.2d at 410, and a closed benefit period situation is one of the most appropriate circumstances in which to do so, *see Kuzmin*, 714 F.2d at 1240, in this case the Secretary has not had the opportunity to address the question of Early's continued disability under the applicable *Kuzmin* standard, and the additional determination of disability in 1982. Accordingly, we will vacate the judgment of the district court and remand this case to the district court with directions that it be remanded to the Secretary for proceedings consistent with this opinion.

---

5. The Secretary appears to argue that Early's alleged failure to take his medicine as prescribed is evidence of medical improvement.

Under 20 C.F.R. § 416.930, the Secretary may terminate benefits if a claimant fails to follow prescribed treatment.